The BUDD COMPANY, WHEEL & BRAKE DIVISION, Plaintiff,

v.

The UNITED STATES, Defendant,

and

FNV Veiculos E Equipamentos S.A., Defendant–Intervenor.

Court No. 88–09–00725.

United States Court of International Trade.

Sept. 5, 1990.

Barnes, Richardson & Colburn, James H. Lundquist, Matthew T. McGrath, and Peter A. Martin, Herman C. Foster, Associate Gen. Counsel, Budd Co., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Platte B. Moring, III, for defendant.

Willkie Farr & Gallagher, William H. Barringer, Arthur J. Lafave, III and Daniel L. Porter, for defendant-intervenor.

## MEMORANDUM OPINION

CARMAN, Judge:

Plaintiff moves for partial summary judgment on the agency record on Counts two and eleven of its complaint, pursuant to Rule 56.1 of the rules of this Court contesting the amended final antidumping duty determination of the International Trade Administration, U.S. Department of Commerce (Commerce) in *Amended Final Determination of Sales at Less Than Fair Value and Amended Antidumping Duty Order; Tubeless Steel Disc Wheels from Brazil*, 53 Fed.Reg. 34,566 (Sept. 7, 1988). Defendant opposing the motion seeks to sustain the determination as supported by substantial evidence on the administrative record and as otherwise in accordance with law. Defendant-intervenor joins defendant.

## BACKGROUND

In *Borlem, S.A. Empreedimentos Industrials and FNV Veiculos E Equipamentos S.A. v. United States*, 12 CIT —, Slip Op. 88–77, 1988 WL 63336 (June 15, 1988), the progenitor of the instant case, where plaintiff was the defendant-intervenor, the parties stipulated to the following facts which are here reprinted in part for convenience:

1. On May 23, 1986, the Department of Commerce (Commerce) received a petition filed on behalf of the Budd Company, Wheel and Brake Division, alleging that imports of tubeless steel disc wheels from Brazil were being, or were likely to be, sold in the United States at less than fair value and that such imports materially injured, or threatened material injury to, a United States industry.

2. On June 12, 1986, Commerce initiated an antidumping investigation to determine whether tubeless steel disc wheels from Brazil were being, or were likely to be, sold in the United States at less than fair value. 51 Fed.Reg. 21,952 (June 17, 1986).

3. On December 19, 1986, Commerce issued a preliminary affirmative determination that imports of tubeless steel disc wheels from Brazil were being, or were likely to be, sold at less than fair value. 51 Fed.Reg. 46,904 (Dec. 29, 1986).

4. In its preliminary determination, Commerce considered the date of shipment to the United States as the date of sale, comparing foreign market value on the date of shipment with U.S. price on the date of shipment. Commerce thus converted foreign market value into U.S. dollars at the exchange rate in effect on the date of shipment. *See* 19 C.F.R. § 353.56(a) (1986).

5. Following its verification of the data provided by respondents, and its consideration of the arguments advanced by the parties at a public hearing and in their written submissions, Commerce published its final affirmative determination of sales at less than fair value. 52 Fed.Reg. 8,947 (Mar. 20, 1987).

6. In its final determination, Commerce calculated the U.S. price of the subject merchandise based on the purchase price of the merchandise sold, or offered for sale, to the United States. 52 Fed.Reg. at 8,948; *See* 19 U.S.C. § 1677a(b) (1982 & Supp. V 1987).

7. In its final determination, Commerce calculated foreign market value, in part, based on constructed value in the month of

shipment to the United States. *See* 19 U.S.C. § 1677b(e)(1)(A) (1982 & Supp. V 1987). Constructed value was calculated based upon the replacement cost of merchandise sold to the United States in the month of shipment to the United States. *Id.*

8. For purposes of its fair value comparison, Commerce compared foreign market value on the date of shipment with U.S. price on the date of sale. In all instances the date of sale preceded the date of shipment. Foreign market values expressed in cruzeiros or cruzados were converted into U.S. dollars using the exchange rate in effect on the date of sale to the United States. *See* 19 C.F.R. § 353.56(a). To explain its currency conversion in the preliminary determination, Commerce stated:

At the time of our preliminary determination, a pattern of long time periods between reported dates of sale and shipment indicated the likelihood that date of shipment reflected the actual date of sale. However, verification has established that all elements necessary to constitute a sale were present at the sale dates reported.

52 Fed.Reg. at 8,950.

Plaintiffs Borlem and FNV in that case moved alternatively for judgment on the pleadings, pursuant to Rule 12(c) or for judgment on the administrative record pursuant to Rule 56.1 of the Rules of this Court. Defendant United States requested the Court to grant plaintiffs' motion for judgment on the pleadings and to remand the action for reconsideration with respect to the complaint. Defendant also requested a remand to correct certain admitted errors. Defendant-intervenor opposed the remand.

The Court granted plaintiffs' motion in that case for judgment on the pleadings and, in the alternative, judgment upon the agency record to the extent that the action was remanded to Commerce as to two counts of the complaint to recalculate the antidumping duty margin and to correct clerical, calculation and transcription errors. The other counts of the complaint were dismissed without prejudice to renew.

Commerce was directed to publish a new determination within 60 days.

The amended determination published by Commerce on September 7, 1988 is the subject of this action.

## DETERMINATION BY COMMERCE

The amended determination of Commerce discussing circumstances of sale adjustments states in part as follows:

[I]n order to capture the effects of Brazil's hyperinflation, we constructed foreign market value for six different one-month periods by using replacement costs for the month of shipment. We then converted the foreign market value into United States currency using the exchange rate in effect for the date of sale in accordance with ... our regulations.

While the above actions are consistent with the Act and our regulations they have, in combination, led to an anomalous result that distorts economic reality and violates the basic purpose of the Act. To remedy this situation, the Department has made a circumstance of sale adjustment to reflect fully the effect of the devaluation of the Brazilian currency during the period of investigation.

... The pertinent facts ... are [set forth] here to enable all parties to understand fully the reasons for the ... determination to make a circumstance of sale adjustment.

... [W]e ... used constructed value as the basis for calculating foreign market value for FNV and for some sales of Borlem. There were either no sales of such or similar merchandise in the home market or to third countries, or there were insufficient sales above the cost of production for certain months. Our usual methodology dictates that we calculate a single constructed value for the period of investigation, but when a country's economy is hyperinflationary, as is Brazil's, we calculate foreign market value on a monthly basis.... Foreign market value constructed for six different one-month periods ... allows us to account for, in part, the dramatic changes

that occur to price and cost variables because of inflation over the six-month period of investigation.

We ... calculate constructed value under our usual methodology by using a company's historic costs.... [W]hen a country's economy experiences hyperinflation, we use replacement costs.... This practice allows the Department to view costs and prices contemporaneously in order to avoid distortions caused by hyperinflation and achieve a fairer comparison. Foreign market value ... was calculated, in part, by using replacement value for raw materials based on actual purchases in a month, or, if actual purchases were not made, on the price list provided by respondents....

Once ... individual constructed values [were calculated] based on replacement costs for each of the six months of the period of investigation, the next step was to compare these foreign market values to individual U.S. sales.... Commerce verified that there were long time periods between the reported dates of sale and the reported dates of shipment [of the goods].... [T]his lag time between date of sale and date of shipment in conjunction with Brazil's hyperinflation gave rise to the problem which [Commerce sought] through a circumstance of sale adjustment, ... to remedy.

... [T]he Act directs that foreign market value shall be constructed as of the date of exportation. 19 U.S.C. § 1677b(e)(1)(A).... [I]n this investigation, we applied the exchange rate that existed on an earlier date of sale to convert constructed value, calculated in the month of shipment, to dollars.

When the date of sale and the date of shipment occur in the same month, use of the date of sale exchange rate to convert foreign market value to dollars makes sense notwithstanding Brazil's hyperinflation. In this instance, foreign market value and the U.S. price are being compared at the same point in time. When date of sale occurs in a month preceding the date of shipment, ... application of the earlier date of sale exchange rate results in a non-contempora-

neous comparison. In effect, the comparison suffers because all the nominal increases in cost between date of sale and date of shipment due to hyperinflation are accounted for by the method in which we constructed foreign market value, while the decreased value of the currency in which those costs are expressed is not. The circumstance of sale adjustment [used by Commerce] eliminates the artificial distortion of value caused by the rapid depreciation of Brazil's currency and ... more accurately provides a measure of whether dumping is occurring. We consider this adjustment as being applicable only in cases where the foreign market value is based upon monthly constructed values because of hyperinflation during the period of investigation and the date the sale occurs in a calendar month preceding the date of exportation.

53 Fed.Reg. at 34,566. Commerce added that the use of the circumstance of sale adjustment, narrowly tailored to the facts of this determination, achieved a correct and fair result. *Id.* at 34,567.

## CONTENTIONS OF THE PARTIES

Plaintiff contends that the reduction by Commerce of the foreign market value of the merchandise, calculated based on the cost of production, by the amount of devaluation of the cruzeiro vis-a-vis the dollar, which occurred between the date of sale and the date of shipment of the merchandise, and the reliance by Commerce on the statutory mechanism of a circumstance of sale adjustment pursuant to 19 U.S.C. § 1677b(a)(4) to adjust for devaluation, altered the normal rule on currency conversion set forth in 19 C.F.R. § 353.56(a) and is therefore not in accordance with law. Plaintiff contends that Commerce adjusted the date of sale exchange rate, resulting in a distorted final determination because it nullified the effects of inflation in Brazil. Brief in Support of Plaintiff's Motion for Partial Summary Judgment at 1–2 (Plaintiff's Brief).

Further contends the plaintiff, Commerce cannot, without violating procedural

due process, use a circumstance of sale adjustment to alter the effect of its currency regulation without engaging in final rule making under the Administrative Procedure Act (APA). *Id.* at 2. Plaintiff also contends that even if it was permissible for Commerce to use a circumstance of sale adjustment that under case precedent and Commerce's regulations the adjustment was not "directly related" to the sales under consideration by Commerce and therefore was improper.

Defendant contends Commerce adjusted constructed value to reflect the additional amount of cruzeiros required to purchase dollars because of the rampant inflation which occurred in Brazil between the date of sale and the date of shipment of the merchandise in accordance with section 773(a)(4)(B) of the Act (19 U.S.C. § 1677b(a)(4)(B)) and section 353.15 of its regulations (19 C.F.R. § 353.15 (1986)). Defendant maintains that Commerce properly adjusted foreign market value, which was constructed as of the date of shipment, to compare it at a common point in the chain of commerce with the United States price, which was calculated as of the date of sale, to eliminate the artificial distortion of value caused by the rapid depreciation of Brazilian currency between these dates. Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment on the Agency Record at 8 (Defendant's Memorandum). Since the adjustment to constructed value properly accounted for a difference in circumstance of sale, the determination of Commerce was based upon substantial evidence and in accordance with law. Further, contends defendant, since Commerce fully explained the methodology it used in the amended final determination in the remand record and made the determination complying with existing statutes and regulations, there was no need to promulgate new regulations in accordance with the APA. Defendant-intervenor's contentions parallel those of Commerce.

## STANDARD OF REVIEW

In reviewing a final determination of the ITA, this Court must hold unlawful any determination unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. Labor Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). When applying the substantial evidence standard "[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo....*'" *American Spring Wire Corp. v. United States*, 8 CIT 20, 22, 590 F.Supp. 1273, 1276 (1984) (quoting *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 464–65, *aff'd sub nom. Armco, Inc. v. United States*, 3 Fed. Cir. (T) 123, 760 F.2d 249 (1985)). "[A]gency interpretations of statutes which they are charged with administering shall be sustained if permissible, unless Congress has directly spoken to the precise question at issue." *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190 n. 9 (Fed.Cir. 1990) (citing *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984)).

## DISCUSSION

■ The Tariff Act of 1930, as amended (the Act), gives the Secretary of Commerce broad latitude to implement the antidumping duty laws. *See Smith–Corona Group v. United States*, 1 Fed.Cir. (T) 130, 132, 145, 713 F.2d 1568, 1571, 1582 (1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). Pursuant to the statutory scheme, antidumping duties will be imposed upon imported merchandise if it is determined that the foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value. *See* 19

U.S.C. § 1673 (1982 & Supp. V 1987).[1] The amount of the antidumping duty shall equal the amount by which the foreign market value exceeds the United States price for the merchandise. *Smith–Corona Group,* 1 Fed.Cir. (T) at 132, 713 F.2d at 1571; *see* 19 U.S.C. § 1673.

United States price is defined as either the purchase price or the exporter's sales price. 19 U.S.C. § 1677a. Foreign market value is computed by one of three methods: (1) home market sales; (2) third country sales; or (3) constructed value. 19 U.S.C. § 1677b. Both United States price and foreign market value are subject to certain adjustments that permit Commerce to "reconstruct the price at a specific, 'common' point in the chain of commerce, so that value can be fairly compared on an equivalent basis." *Smith–Corona Group,* 1 Fed. Cir. (T) at 132, 713 F.2d at 1572; 19 U.S.C. § 1677a(d)-(e) and 1677b(a)(4).

Section 773(a)(4) of the Tariff Act of 1930 as amended, gives Commerce explicit statutory authority to account for adjustments in its calculation of foreign market value by use of a circumstance of sale adjustment. 19 U.S.C. § 1677b(a)(4). The provision states in pertinent part as follows:

> In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value (or that the fact that the United States price is the same as the foreign market value) is wholly or partly due to—
>
> ....
>
> (B) other differences in circumstances of sale....
>
> then due allowance shall be made therefor.

19 U.S.C. § 1677b(a)(4). The correlative regulation, 19 C.F.R. § 353.15, provides the following general guidelines in subpart *a:*

> In comparing the United States price with the sales, or other criteria applica-

ble, on which determination of foreign market value is to be based, reasonable allowances will be made for bona fide differences in the circumstances of the sales compared *to the extent that it is established to the satisfaction of the Secretary* that the amount of any price differential is wholly or partly due to such differences. *Differences in circumstances of sale for which such allowances will be made are limited, in general, to those circumstances which bear a direct relationship to the sales which are under consideration.*

*Id.* (emphasis added).

This Court has upheld the use of circumstance of sale adjustments in cases where foreign market value was calculated on the basis of constructed value. *Timken Co. v. United States,* 11 CIT 786, 798, 673 F.Supp. 495, 507–08 (1987); *Sonco Steel Tube Div., Ferrum, Inc. v. United States,* 13 CIT ——, ——, 714 F.Supp. 1218, 1223 n. 6 (1989); *Funai Elec. Co., Ltd. v. United States,* 13 CIT ——, ——, 713 F.Supp. 420, 423–25 (1989).

In addressing Commerce's discretion to employ circumstance of sale adjustments, courts have concluded that Commerce enjoys broad discretion. The Court of Appeals for the Federal Circuit has stated:

> The express language of section 1677b(a)(4) provides that allowances will be made if it is established *to the satisfaction of the Secretary* that the amount of difference between the United States price and the foreign market value of the merchandise is wholly or partly due to differences in circumstances of sale. The statute does not expressly limit the exercise of the Secretary's authority to determine adjustments, nor does it include precise standards or guidelines to govern the exercise of that authority. Additionally, the statute does not define the term "circumstances of sale" nor does it prescribe any method for determining allowances. Congress has de-

---

**1.** Additionally, of course, in this case, in order for antidumping duties to be imposed there also had to be a determination by the International Trade Commission that an industry in the Unit-

ed States was materially injured, or threatened with material injury by reason of the imports of the dumped merchandise. *See* 19 U.S.C. § 1673.

ferred to the Secretary's expertise in this matter.

*Smith–Corona Group*, 1 Fed.Cir. (T) at 136–37, 713 F.2d at 1575 (emphasis in original) (footnote omitted).

Additionally, the Court has noted that Commerce is required by statute to make a "fair comparison," between United States price and foreign market value. *Id.* at 140, 713 F.2d at 1578; *accord Consumer Prod. Div., SCM Corp. v. Silver Reed America, Inc.*, 3 Fed.Cir. (T) 83, 90–91, 753 F.2d 1033, 1039–40 (1985). In furtherance of this goal "[b]oth the United States price and the foreign market value are subject to cost adjustments in an attempt to derive values at a *common point in the chain of commerce*, so that the values reasonably can be compared on an equivalent basis." *Washington Red Raspberry Comm'n v. United States*, 859 F.2d 898, 904 & n. 36 (Fed.Cir.1988) (citing *Smith–Corona Group*, 1 Fed.Cir. (T) at 132, 713 F.2d at 1571–72) (emphasis added).

As a general matter, the Court of Appeals for the Federal Circuit has emphasized that fairness is the touchstone of Commerce's duty in enforcing the antidumping laws. In the Court's words, Commerce has a

> duty to enforce fairly the antidumping laws by determining whether [less than fair value (LTFV)] sales are or are *not* occurring. The purpose of the antidumping law, as its name implies, is to discourage the practice of selling in the United States at LTFV by the imposition of appropriately increased duties. That purpose would be ill-served by application of a mechanical formula to find LTFV sales, and thus a violation of the antidumping laws, where none existed. A finding of LTFV sales based on a margin resulting *solely* from a factor beyond the control

of the exporter would be unreal, unreasonable, and unfair.

*Melamine Chemicals, Inc. v. United States*, 2 Fed.Cir. (T) 57, 67–68, 732 F.2d 924, 933 (1984) (emphasis in original). In this regard, this Court has determined that dumping margins should not be based wholly on misapplication of exchange rates. *Luciano Pisoni Fabbrica Accessori v. United States*, 10 CIT 424, 430, 640 F.Supp. 255, 260–61 (1986) (unreasonable for Commerce to find dumping due solely to effect of reliance on quarterly exchange rates); *accord Pistachio Group v. United States*, 11 CIT 668, 676–77, 671 F.Supp. 31, 38 (1987). In sum, courts will not sanction Commerce's use of circumstance of sale adjustments if to do so would "bring about results which appear to be entirely absurd and unfair." *Funai Elec. Co., Ltd.*, 13 CIT at ——, 713 F.Supp. at 424; *Timken Co.*, 11 CIT at 798, 673 F.Supp. at 507–08.

■ Central to plaintiff's contentions is the claim that Commerce, by using the circumstance of sale adjustment, engaged in rulemaking that altered the currency conversion regulations and deprived plaintiff of procedural due process.

Nineteen C.F.R. § 353.56(a)(1) requires Commerce to convert foreign currency into its equivalent in United States currency as of the date of "purchase or agreement to purchase," that is, the date of sale.[2] Examination of the record confirms that in the amended determination Commerce, after making the circumstance of sale adjustments, converted foreign market value as expressed in Brazilian cruzeiros to United States dollars at the exchange rate in effect as of the date of sale in compliance with the regulation. 53 Fed.Reg. at 34,568; *and see* Conf.Rec.Docs. 1, 2.

Plaintiff does not dispute this, but argues that Commerce used the circumstance of sale adjustment to create an unlawful

---

2. Commerce's currency conversion regulation provides in part as follows:

In determining the existence and amount of any difference between the United States price and the fair value or foreign market value for the purposes of this part or of the Act, any necessary conversion of a foreign currency into its equivalent in United States currency shall be made in accordance with the provisions of section 522 of the Tariff Act of 1930, as amended (31 U.S.C. 372):

(1) As of the date of purchase or agreement to purchase, if the purchase price is an element of the comparison....

19 C.F.R. § 353.56(a).

exception to the currency conversion regulations without engaging in the requisite notice and comment under the APA, thereby depriving plaintiff of procedural due process.

Commerce denies that it engaged in rulemaking and argues that, in any event, formal rulemaking requirements do not apply to Commerce determinations when the agency makes a case-by-case determination and explains its decision fully on the administrative record. Commerce also argues that even if the effect of the circumstance of sale adjustment was to undermine the currency conversion regulations, it was lawful because the adjustment furthered the statutory goal of effecting a fair comparison of foreign market value and United States price on an equivalent basis at a common point in the chain of commerce.

The Court concludes that Commerce was not engaged in rulemaking. It is apparent to this Court that Commerce's methodology was designed to address a conflict between the comparison of foreign market value, calculated monthly by using constructed value as of the *date of shipment,* and the United States price calculated as of the *date of sale,* in order to effect a contemporaneous comparison of the two values in this case. Commerce fashioned a remedy that was reasonably calculated to diminish the effects of this conflict and carry out the calculation of monthly constructed foreign market values that Commerce determined would yield the most reliable gauge of sales at less than fair value.[3] Because Commerce fully explained its decision on the record of this case, this Court finds that Commerce did not deprive plaintiff of procedural fairness under the APA or otherwise. *Washington Red Raspberry Comm'n,* 859 F.2d at 902–04 (in absence of formal rulemaking procedures, Commerce's explanation of its decision to apply the *de minimis* rule was sufficient for court to uphold its application in case under review); *Carlisle Tire & Rubber Co. v. United States,* 10 CIT 301, 304–06, 634 F.Supp. 419, 422–24 (1986) (adopted by Federal Cir-

cuit in *Washington Red Raspberry Comm'n,* 859 F.2d at 903) (absent publication of rule pursuant to APA notice and comment procedures, Commerce must explain the basis for its decision); *Ipsco, Inc. v. United States,* 12 CIT ——, ——, 687 F.Supp. 614, 626–31 (1988) (same); *see also, e.g., SEC v. Chenery Corp.,* 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947) (administrative agency has discretion to resolve unforeseeable problems on case-by-case basis or through a general rule or regulation); *accord NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 1771–72, 40 L.Ed.2d 134 (1974).

■ Moreover, in light of the agency's overriding duty to make fair comparisons between foreign market value and United States price, this Court agrees with Commerce that to the extent the circumstance of sale adjustment conflicted with the currency conversion regulations, it was appropriate for Commerce to choose to effectuate the primary statutory purpose in favor of fair determinations based on contemporaneous comparisons. *See Smith–Corona Group,* 1 Fed.Cir. (T) at 140–41, 713 F.2d at 1578; *Consumer Prod. Div., SCM Corp.,* 3 Fed.Cir. (T) at 90–91, 753 F.2d at 1039–40. It would appear that were Commerce to do otherwise, dumping margins would result solely from the application of exchange rates, a circumstance which was wholly beyond the control of the exporters, an unacceptable outcome. *See Melamine Chemicals, Inc.,* 2 Fed.Cir. (T) at 67–68, 732 F.2d at 933.

■ Plaintiff also contends that even if Commerce was required to make some adjustment to account for the hyperinflation in Brazil's economy, it was unlawful for Commerce to use a circumstance of sale adjustment because hyperinflation is a general economic condition, not a selling expense "directly related" to the sales in this case within the meaning of the statute, regulations and legislative history. Plaintiff primarily relies upon two decisions of this Court in which Commerce's denial of circumstance of sales adjustments were up-

---

**3.** The Court notes that none of the parties has objected to Commerce's utilization of monthly comparisons over a six month period as its investigative methodology.

held: *Negev Phosphates, Ltd. v. United States*, 12 CIT ——, 699 F.Supp. 938 (1988) and *LMI–La Metalli Industriale, S.p.A. v. United States*, 13 CIT ——, 712 F.Supp. 959 (1989), *aff'd in part, rev'd in part*, 912 F.2d 455 (Fed.Cir.1990).

In response, Commerce concedes that it has "normally limited [circumstance of sale] adjustments to those instances in which the differences in selling practices between the United States and home markets are directly related to the sales under consideration." Defendant's Memorandum at 15. But Commerce also argues that it is not limited by the examples of circumstances of sales enumerated in 19 C.F.R. 353.15(b), and argues, relying upon *Southwest Florida Winter Vegetable Growers Ass'n v. United States*, 7 CIT 99, 584 F.Supp. 10 (1984), that it may "adjust foreign market value for factors, characteristic of the market, which bear a reasonably direct effect upon the sales under consideration." Defendant's Memorandum at 15. Commerce further contends that under the unique and limited factual circumstances of this case, the circumstance of sale adjustment was directly related to the actual sales under consideration, that is, the sales used to construct monthly values over a six month period on the basis of replacement costs. Commerce contends that there is substantial evidence on the record to support its determination and asserts that *Negev* and *LMI* actually support Commerce's decision to use a circumstance of sale adjustment in this case.

In its amended final determination Commerce addressed and rejected plaintiff's argument with the following reasoning:

Section 773(a)(4)(B) [19 U.S.C. § 1677b(a)(4)(B)] permits an adjustment to foreign market value for "other circumstances of sale" without limiting the adjustment to directly related selling expenses. Similarly, [19 C.F.R.] § 353.15(a) of our regulations permit [sic] an adjustment for "bona fide differences in the circumstances of sales compared."

While petitioner is correct that the Department typically uses circumstances of sale adjustments to adjust for different selling expenses incurred in the two markets, we are not precluded from using this provision to achieve a result that reflects economic reality and is consistent with the basic purpose of the Act. In this regard, in order to fairly compare foreign market value and United States price on an equivalent basis, "[b]oth values are subject to adjustment in an attempt to reconstruct the price at a specific 'common' point in the chain of commerce." *Smith–Corona Group v. United States*, 713 F.2d 1568, 1571–72 (Fed. Cir.1983) *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

Lacking a circumstance of sale adjustment, Commerce's original final determination failed to achieve this goal. Specifically, the circumstances under which Commerce constructed foreign market value failed to adjust for, and thus reconstruct, a reference point whereby these values are being compared with the U.S. price at the same point in time.... *See generally Southwest Florida Winter Vegetable Growers Ass'n v. United States*, 584 F.Supp. 10 (1984) (Commerce took account of differences in ripeness of the merchandise and time of day of sale, a concept similar to the rapid devaluation resulting from a hyperinflationary economy, in order to achieve a fair comparison).

Finally, ... our regulations have long recognized that special circumstances may require us to compensate where a strict application of our currency rules leads to an incorrect result. Application of a circumstance of sale adjustment in these special situations achieves the correct and fair result.

53 Fed.Reg. at 34,567.

In *Negev*, this Court upheld Commerce's denial of Negev's request for a circumstance of sale adjustment for payments made to Negev under a program entitled Exchange Rate Risk Insurance Scheme (EIS). The EIS program provided rebates for differences in exchange rates vis-a-vis inflation. 12 CIT at ——, 699 F.Supp. at 943. The EIS rebate was determined by the difference between the movement of

the exchange rate of a basket of currencies and local inflation. *Id.* Commerce determined that the EIS payments did not qualify for a circumstance of sale adjustment because they were not the type of expense or credit that Commerce allowed adjustments for, nor did the EIS payments satisfy the requirements of 19 C.F.R. § 353.15, *inter alia*, that the payments be directly related to the sales under consideration. *Id.* At oral argument in *Negev*, however, Commerce conceded that the "payments were tied to" the sales in issue. *Id.* 12 CIT at ——, 699 F.Supp. at 944.

The Court noted that the EIS payments did not fall under any of the enumerated examples of circumstance of sale adjustments in 19 C.F.R. § 353.15,[4] and noted that "Commerce found the EIS program to be strictly a benefit conferred upon the seller, which Commerce determined to be a countervailable subsidy in the companion investigation." *Id.* 12 CIT at ——, 699 F.Supp. at 945. The Court further noted that the EIS payments did not account for any difference in the price of the sales Commerce compared. "The price that Negev charged its United States and home market purchasers for its product was not affected by the EIS payments." *Id.* The Court found that Commerce's determination to disallow a circumstance of sale adjustment was reasonable given that the "method of calculating the EIS payment [was] not related to the price of the product that Negev established at the time of the sale." *Id.*

In *LMI*, this Court upheld Commerce's denial of a requested circumstance of sale adjustment for certain currency hedging expenses that LMI used for home market sales to cover foreign exchange exposure in the purchase of imported raw materials. 13 CIT at ——, 712 F.Supp. at 966. The Court found that LMI was

unable to distinguish between the raw materials it purchase[d] with hard currency earned from United States sales and that which it purchase[d] on a currency hedging basis. It is not possible to determine whether the raw materials purchased with currency hedging were even used to produce the merchandise under investigation, because there is 'no ear-marking of particular zinc or copper.' *Id.* 13 CIT at ——, 712 F.Supp. at 967. The Court concluded that LMI had not met its burden of proving "to the satisfaction of Commerce that the currency hedging expenses were directly related to sales of the merchandise under investigation," and upheld Commerce's denial of the circumstance of sale adjustment. *Id.* 13 CIT at ——, 712 F.Supp. at 967–68. This determination was recently upheld by the Court of Appeals for the Federal Circuit. *LMI–La Metalli Industriale, S.p.A. v. United States*, 912 F.2d 455 (Fed.Cir.1990).

Neither *Negev* nor *LMI* control Commerce's use of a circumstance of sale adjustment in this case. In *Negev* the circumstance of sale adjustment requested concerned a governmental program that allegedly distorted the calculation of fair market value. Here, it was Commerce's choice of methodology, the monthly calculation of constructed foreign market value over a six month period to take into account Brazil's hyperinflation considered in juxtaposition with the other characteristics of the economy of Brazil, that resulted in the distorting effect on foreign market value. Furthermore, in *Negev*, unlike the case at bar, the claimed adjustment did not have an effect on the price of the sales Commerce compared. In *LMI*, Commerce determined, and the Court agreed, that the adjustment claimed was *not* directly related to the sales under consideration. In both *Negev* and *LMI*, Commerce was confronted with calculations of foreign market value based

---

**4.** 19 C.F.R. § 353.15(b) lists the following examples of circumstance of sale adjustments:

Examples of differences in circumstances of sale for which reasonable allowances generally will be made are those involving differences in credit terms, guarantees, warranties, technical assistance, servicing, and assumption by a seller of a purchaser's advertising or

other selling costs. Reasonable allowances also generally will be made for differences in commissions. Allowances generally will not be made for differences in advertising and other selling costs of a seller, unless such costs are attributable to a later sale of the merchandise by a purchaser.

upon home market sales, not monthly constructed values based on replacement costs. In both *Negev* and *LMI*, this Court deferred to the agency's discretion in determining whether the claimed circumstance of sale adjustment was reasonably related to sales under consideration and was otherwise within the ambit of its regulations.[5]

Congress has stated that circumstance of sale adjustments "should be permitted if they are reasonably identifiable, quantifiable, and directly related to the sales under consideration and if there is clear and reasonable evidence of their existence and amount." H.R.Rep. No. 317, 96th Cong., 1st Sess. 76 (1979), U.S.Code Cong. & Admin.News 1979, 381. Congress has also given the Secretary of Commerce broad discretion in determining when a circumstance of sale adjustment should be given in a fair value investigation. *Smith–Corona Group*, 1 Fed.Cir. (T) at 136–37, 713 F.2d at 1575. The Court finds that Commerce did not exercise its discretion in a manner that violated the mandates of the statutory scheme, its regulations or the legislative intent underlying the antidumping laws in utilizing a circumstance of sale adjustment to adjust foreign market value, based upon monthly constructed values because of hyperinflation during the period of investigation, when the date of sale occurred in a calendar month preceding the date of exportation.

## CONCLUSION

In accordance with the foregoing, this Court concludes that Commerce's determination to use a circumstance of sale adjustment was reasonable, in accordance with law and based upon substantial evidence. Accordingly, plaintiff's Rule 56.1 motion for partial summary judgment is denied and counts two and eleven of the complaint are dismissed.

---

5. This result is consistent with this Court's holding in *Southwest Florida Winter Vegetable Growers Ass'n,* 7 CIT 99, 584 F.Supp. 10 wherein this Court upheld Commerce's decision to use a circumstance of sale adjustment to account for

factors characteristic of the market for fresh produce such as quality, ripeness and time of day of sale, in order to make a fair comparison of foreign market value and United States price.